ROBERT P. MARKMAN, Plaintiff-Appellant. *v.* THE CITY OF HARVEY, Defendant-Appellee.

First District (3rd Division)   No. 62836

Opinion filed March 30, 1977.—Rehearing denied November 3, 1977.

Julia M. Hagerty, of Chicago, for appellant.

Robert E. Wiss, of Foran, Wiss & Schultz, of Chicago, for appellee.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

This suit, commenced in 1959, was brought by the plaintiff, Robert P. Markman, requesting the reinstatement of certain cancelled special assessment bonds, vouchers, and coupons issued by the defendant, city of Harvey (hereinafter the city). Plaintiff also asked that the city be compelled to make an accounting of special assessment funds allegedly improperly withheld by the city. The city filed a counterclaim charging that certain checks drawn by plaintiff to pay for special assessments had been dishonored. The matter was referred to a Master in Chancery in 1959, and in 1975 the master issued his findings recommending judgment for plaintiff on his complaint. The master also recommended judgment for the city on its counterclaim. The trial court disapproved the master's report as to his recommendations on plaintiff's complaint and accepted his findings on the city's counterclaim. On appeal, plaintiff has raised the following issues: whether the 1954 agreement between plaintiff and the city to pay plaintiff his proportionate share of special assessment monies in return for cancellation of certain bonds is void because the city as trustee for all bondholders did not possess the right to effect a settlement for payment of the funds collected and owing to the owners of the bonds; whether the trial court ruled correctly that the master's determination of illegality as to the 1954 contract exceeded the parameters of the pleadings; and whether the trial court erred in denying plaintiff leave to file an additional answer to the city's counterclaim.

The pertinent facts are as follows. In March 1953, the city conducted a sale and assignment of the liens under certain special assessment bonds issued by it in the 1920's. The proceeds of the sale amounted to $200,000 out of which plaintiff was paid $120,000 which amount corresponded to the percentage of bonds owned or controlled by plaintiff in the area sold and assigned. At the time of the sale, plaintiff also owned bonds outside that area. The face value of his holdings of special assessment bonds issued by the city totalled $265,534.93 or $278,062.98. (The uncertainty as to the total exists because the evidence is unclear as to when plaintiff acquired the paper in a certain warrant.)

At the sale plaintiff represented certain investors as well as himself and was authorized to bid up to a designated amount for the liens. Having been overbid at the sale, he entered into an agreement with the investors whom he represented whereby plaintiff retained the paper and the investors received $120,000, the proceeds of the sale.

In November 1954, plaintiff entered into an agreement with the city

concerning all the bonds owned by him throughout the city. This agreement related to the special assessment funds held by the city and payable to the owners of the outstanding bonds. The contract is evidenced by the minutes of the city council and its essence is set forth in paragraph 2 of a letter written by plaintiff to the city commissioner of finance and city treasurer:

"2. In return for my proportionate share of special assessment funds held by the City of Harvey, excepting any proceeds which might be due from the sale and assignment, I propose to surrender any and all rights which might have accrued on any such bonds, from the past up to the present, retaining only the right to collect funds coming into the City's hands after the agreed amount of dis•.ibution has been reduced on the bonds themselves. I would specifically be entitled to any funds received by the City of Harvey from the County Treasurer before the date of distribution of past funds has been endorsed on my bonds, but received from the County Treasurer by the City of Harvey, after said date."

Plaintiff also agreed to deposit all his outstanding bonds with the city and secure a performance bond for the agreement. As to his holdings within the area sold and assigned, plaintiff relinquished all rights except to foreclosure monies collected and he agreed to the cancellation of the bonds by the city. Regarding the other bonds, it was agreed that the city would hold them in escrow and that plaintiff would be entitled to his share of future collections.

Pursuant to the 1954 agreement, the city paid plaintiff a total of $34,680 out of the $129,099.99 on hand in the special assessment fund. The final payment of special assessment funds to plaintiff occurred in February 1955. In a letter to the city treasurer dated February 18, plaintiff relinquished all claim to past-due funds on the balance of his bond holdings as of March 15, 1953, except for foreclosure monies. Subsequent to the final payment of foreclosure monies, plaintiff, on June 11, 1957, again wrote authorizing cancellation of the bonds within the area sold and assigned.

On April 13, 1959, plaintiff filed the present action to set aside the cancellation of his special assessment bonds on the grounds of misrepresentation, duress, and breach of trust by the city in causing him to surrender his bonds. He also requested an accounting of special assessment funds since payments of the bonds were alleged to have been improper. In an amended complaint, plaintiff charged that the city improperly deducted a two-percent collection fee and demanded interest because of the alleged delay in paying him the proper amount owed. In another amended complaint, plaintiff sought a declaration that there had been no agreement between the parties and requested that the parties be

returned to their original positions. In the alternative, if such an agreement was found to exist, a declaration was sought that the city had failed to pay plaintiff his full share as agreed.

The city denied plaintiff's allegations and pleaded the affirmative defense of settlement, release, or waiver. As already noted, the city also filed a counterclaim.

The hearings commenced before the master in December 1966 and continued until August 1974. Plaintiff's case was presented essentially through his own testimony. While that testimony varied somewhat over the course of the hearings and is difficult to summarize, it appears that his claim is that the city had agreed to pay him 50 to 60 percent of the special assessment funds on hand at the time the agreement was executed in 1954. He stated that the city paid him less than the amount to which he was entitled under the 1954 agreement. He stated that in 1957 he first discovered that he had not been paid what he claimed was his full share of the funds. At that time he was working on another special assessment matter in the city treasurer's office when he came across what he testified were the "black balances" for cash register No. 1. Plaintiff testified that those figures evidenced an $80,000 surplus, a percentage of which should have been paid him under the 1954 agreement.

Anthony M. Fredericks, a certified public accountant, testified for the city that his inspections of the city's books and records revealed that in 1954 plaintiff held approximately 23 percent of the outstanding bonds issued by the city. On November 1, 1954, the total special assessment monies on hand totalled $129,099.99, and 23 percent of that amount equaled $29,692.77. Pursuant to the 1954 agreement, the city paid plaintiff $34,680.00 from that fund. The witness reviewed the payments to plaintiff and testified that in several instances plaintiff was paid in excess of his pro rata share owing on the warrants.

George Gilley, former commissioner of finance, testified for the city that in 1954 it entered into an agreement with the plaintiff whereby it would pay him a proportionate share of the special assessment funds on hand. According to the witness, there never was any agreement or understanding to pay plaintiff 50 percent of the special assessment funds held by the city at that time. Gilley also testified that at all times plaintiff was afforded access to the books and records of the city.

Regarding the counterclaim, the city presented the testimony of the city clerk that plaintiff had issued two checks to the city in payment of certain special assessments. The checks were dishonored by the drawee bank and the amounts owed by plaintiff were never paid. Plaintiff presented no defense to the counterclaim.

Subsequent to the close of proof before the master, plaintiff filed another amended complaint allegedly to conform to the proof adduced.

In the third amended complaint plaintiff charged that the 1954 agreement called for payment to him of 50 percent of the assessment funds on hand, exclusive of the sale and assignment monies. Plaintiff further alleged that he had received approximately $34,000 of the almost $130,000 on hand while he should have received approximately $64,500. Pleading in the alternative, plaintiff alleged that his 1954 agreement with the city constituted a breach of the city's duty as trustee of the funds owed to plaintiff and other bondholders. Plaintiff prayed that the agreement be set aside, his cancelled bonds reinstated, and that the city be required to pay him $88,197.53. He alleged that this latter amount represented funds due plus statutory interest.

In his report the master concluded that the city had breached its fiduciary duty to the bondholders and was personally liable for all damage flowing from its wrongful conduct. The master recommended judgment for plaintiff in the amount of $242,584.80. The master recommended judgment for the city on its counterclaim in the amount of $6,754.54.

The trial court rejected the master's report and recommendation on plaintiff's complaint. The court accepted the recommendations as to the city's counterclaim. After entry of judgment by the trial court in accordance with those conclusions, plaintiff filed a post trial motion contending that the master's report was correct, and that the trial court's judgment was contrary to law and fact. Plaintiff also sought leave to file an additional answer to the city's counterclaim. The additional answer sought to raise the defense of discharge in bankruptcy to the claim of the city. The trial court denied the plaintiff's motions.

We initially shall consider whether the city violated its fiduciary duty in entering into an agreement with the plaintiff to pay him his proportionate share of the special assessment funds which it held in trust for the owners of the outstanding bonds. The landmark case dealing with the proper distribution of special assessment funds on such bonds is *Rothschild v. Village of Calumet Park* (1932), 350 Ill. 330, 183 N.E. 337. In that case the supreme court held that the monies paid on each installment and collected by the municipality become a trust fund which is to be paid out to the owners of the bonds, without preference among them. If a deficiency in any installment exists, the loss must be borne ratably by each bondholder. At page 339, the court described the manner in which the funds held must be paid out to the bondholders:

> "[W]hen the bonds of any year become due and the collection from the installment of that year is insufficient to pay them, the bondholders are entitled to the amount collected, and it is the duty of the trustee—the municipality—to pay upon each bond issued against the installment its share, *pro rata,* of that amount."

■■ It was thus incumbent upon the city to pay out on a *pro rata* basis the past due funds which had been collected and were being held for the bondholders. *Sampson v. Village of Stickney* (1962), 24 Ill. 2d 134, 180 N.E.2d 457.

It is plaintiff's position in this court that the 1954 agreement constituted a breach of the fiduciary duty which the city owed the holders of the outstanding bonds because it called for payment of 50 percent of the funds to plaintiff. This argument was not advanced in the trial court. An examination of the agreement coupled with Gilley's testimony concerning the intent of the parties demonstrates the speciousness of plaintiff's claim. Paragraph two of plaintiff's letter to the city explicitly states that plaintiff agreed that the city would pay him only his "proportionate share." Gilley testified that at no time was the term proportionate share intended to mean 50 to 60 percent of the funds on hand.

Plaintiff maintains that the absence of the term *"pro rata"* leaves the provisions of the agreement open to interpretation and lends credence to his claim that the city agreed to pay him 50 to 60 percent of the special assessment funds on hand. This argument is totally without support in the record. While plaintiff owned 50 to 60 percent of the bonds issued in the area sold and assigned, his entire bondholdings equalled only 23 percent of all the outstanding bonds, both within and without the area sold and assigned. The agreement in question dealt with plaintiff's claim for funds due on all of the bonds which he held. Gilley's testimony revealed that plaintiff was to receive that share of the special assessment fund which represented the proportion which his holdings bore to all of the outstanding bonds and upon which payments out of the fund were due.

■■ The plaintiff also claims that the city favored itself on the bonds which it owned and that it withheld funds owing in 1954. This, the plaintiff claims, was a violation of its duty as trustee and requires the rescission of the 1954 agreement. Plaintiff's third amended complaint and the accountant's testimony established that in 1954 the city held $129,099.99 in special assessment funds. Plaintiff was paid approximately $34,000 out of that amount. The accountant also testified that his review of the records indicated that in most instances plaintiff was paid in excess of the amount owed him on particular installments. Aside from plaintiff's assertion, never explained or supported, that the city withheld $80,000, the record is devoid of any evidence which might prove that plaintiff was deprived of any money to which he was entitled. Rather, the evidence supports the accountant's testimony that plaintiff was paid all to which he was entitled. The terms of the agreement in question were in accord with the mandate of *Rothschild* and the absence of the expression *"pro rata"* does not affect the legitimacy of this contract. The use of the term

"proportionate share" was sufficient to evidence compliance with the rule set forth in *Rothschild.*

Plaintiff next contends that the trial court erred in holding that the master's findings exceeded the parameters of the pleadings.

In his final amended complaint plaintiff pleaded in the alternative. He first sought a declaration that the 1954 agreement called for payment of 50 percent of the some $129,000 on hand. In the alternative, he requested that the contract be rescinded because of the deceptive practices of the city and the withholding of funds rightfully due plaintiff. Under this theory he requested judgment in the amount of $88,197.53.

■■ The master's theory was that both parties were cognizant of the contract's illegality from its inception. The master concluded that such awareness was evidenced by plaintiff's letter to the city commissioners in which he pointed out that execution of the agreement would eliminate the necessity of a law suit to ascertain the validity of the sale of the liens, claims by remaining bondholders, and suits emanating from diversions. The master labeled the above reasons offered by plaintiff to be improper motives which had prompted the city to execute the agreement in 1954. He also found the requirement that plaintiff secure a performance bond to be evidence of the illegality of the agreement. These findings of the master resulted in a singular theory of liability and in the recommendation of judgment for plaintiff far in excess of that sought by the pleadings.

Section 34 of the Civil Practice Act (Ill. Rev. Stat. 1973, ch. 110, par. 34) provides in pertinent part:

> "Except in case of default, the prayer for relief does not limit the relief obtainable, but where other relief is sought the court shall, by proper orders, and upon terms that may be just, protect the adverse party against prejudice by reason of surprise."

The master's report exceeds any theory pleaded and proved by plaintiff during the lengthy course of these proceedings. Plaintiff never pleaded or offered evidence on the issue of a purported breach of the city's fiduciary duty due to overpayments of himself. From commencement of the suit, plaintiff maintained that the city withheld funds properly due him. The master, however, cited the illegality of both parties' conduct, but found that since the city occupied the position of trustee in relation to the special assessment funds, the parties were not in *pari delicto.* Since such a theory was never offered throughout the hearings, a finding based upon that position is patently erroneous. The trial court, therefore, was correct in holding that the master's findings went beyond the parameters of the pleadings.

Plaintiff finally contends that the trial court erred in denying him leave to file an additional answer to defendant's counterclaim. In his motion

plaintiff sought to plead an order of discharge in bankruptcy as a defense.

The counterclaim was filed in 1959 when plaintiff initiated these proceedings. The discharge in bankruptcy purportedly occurred in 1962. The hearing on the counterclaim was conducted in October 1974. Plaintiff presented no defense to the counterclaim. Judgment on the counterclaim was entered on June 12, 1975. On July 10, 1975, plaintiff sought to file the additional answer.

Section 46 of the Civil Practice Act (Ill. Rev. Stat. 1973, ch. 110, par. 46(1)) provides in pertinent part:

"(1) At anytime before final judgment amendments may be allowed on just and reasonable terms, * * * adding * * * defenses, * * * which may enable * * * the defendant to make a defense * * *."

■■ The record clearly demonstrates that plaintiff sought to raise this new defense 28 days after entry of final judgment. He cannot avail himself of section 46 of the Civil Practice Act because his amended answer would raise a new issue after the entry of judgment. (*People ex rel. Gustafson v. Calumet City* (1968), 101 Ill. App. 2d 8, 241 N.E.2d 512.) Plaintiff had ample opportunity to answer the counterclaim and to raise the defense of discharge in bankruptcy. The trial court correctly denied his motion to file an additional answer.

For the reasons stated, the judgments of the circuit court of Cook county are affirmed.

Judgments affirmed.

JIGANTI and McGILLICUDDY, JJ., concur.